BANKERS INSURANCE COMPANY,

     Plaintiff,

                       Case No. 8:10-cv-2650-T-33EAJ

v.

AMERICAN TEAM MANAGERS, INC.,

     Defendant.

_____/

## ORDER

This matter comes before the Court pursuant to Plaintiff Bankers Insurance Company's Dispositive Motion for Partial Summary Judgment (Doc. # 45), filed on February 10, 2012. Defendant American Team Managers, Inc. (ATM) filed a response in opposition to the motion on February 27, 2012 (Doc. # 48), to which Plaintiff filed a reply on March 22, 2012 (Doc. # 51). Also before the Court is Defendant's Dispositive Motion for Summary Judgment (Doc. # 46), filed on February 10, 2012. Plaintiff filed a response in opposition to the motion on February 27, 2012 (Doc. # 47), to which Defendant filed a reply on March 22, 2012 (Doc. # 52).

After due consideration and for the reasons stated in this Order, Plaintiff's motion for summary judgment is granted in part and denied in part and Defendant's motion for summary judgment is denied.

## I.   Factual Background

The following statement of facts is taken from the parties' Joint Pretrial Statement (Doc. # 56).

The relationship between Bankers, an insurance company, and ATM, its former general managing agent, began on or around September 20, 1998, when Bankers entered into a General Agency Agreement with ATM, pursuant to which ATM was required to act as Bankers' General Agent to produce and administer insurance policies underwritten by Bankers. The General Agency Agreement authorized ATM to write policies through duly licensed insurance brokers, agents, producers or other such entities. As General Agent, ATM had authority to bind coverage. Pursuant to the Agreement and on behalf of Bankers, ATM issued general commercial liability coverage, with a total policy limit of $1 million, to Ollin International for the policy period of June 19, 2002, to June 19, 2003. Ollin applied for this coverage through its broker, Warren Doctor and/or Doctor Insurance Agency. A July 15, 2002, brokerage agreement defined the terms and scope of ATM's relationship with Doctor. Pursuant to that agreement, Doctor submitted Ollin's insurance application to ATM and ATM then procured and issued the Bankers policy to Ollin.

On September 30, 2002, ATM terminated the brokerage

agreement with Doctor.  The termination letter left open the opportunity for Doctor to seek renewal policies for existing customers, but advised Doctor that he would not be entitled to commissions.  ATM did not inform Ollin that Doctor had been terminated.  On April 23, 2003, ATM wrote to Doctor offering to renew Ollin's Bankers policy upon receipt of a premium payment on or before June 16, 2003.  Despite the provision in the termination letter, ATM's offer to Doctor to renew Ollin's policy included an offer to Doctor to receive a commission for the renewal.

On June 19, 2003, Ollin's policy expired.  On July 7, 2003, ATM wrote to Doctor confirming the lack of response to ATM's April 23, 2003, letter.  ATM's letter stated that no new policy had been bound and offered to rewrite the risk as new business upon the submission of a new application and a "no loss" letter from Ollin.  No new application or no loss letter were ever submitted.

Also on July 7, 2003, by facsimile to ATM, Doctor requested renewal of Ollin's Bankers policy and advised that the premium payment would be placed in the mail.  On July 8, 2003, Doctor mailed Ollin's premium payment to ATM.  On July 28, 2003, ATM wrote to Doctor advising that it would not issue a renewal of the Bankers policy and that no coverage had been

bound and returning the policy premium. ATM did not directly inform Ollin that its Bankers policy would not be renewed or rewritten.

Notwithstanding this information and unbeknownst at the time to ATM or Bankers, Doctor issued a Certificate of Liability Insurance to Ollin stating that coverage from Bankers was in place for the period of June 20, 2003, to June 20, 2004. Also unknown at the time to ATM and Bankers, Doctor retained the premium payment made by Ollin.

On October 28, 2003, Kenneth Bloor, a granite worker, sustained serious injuries during the unloading of granite slabs sold by Ollin to Bloor's employer. Bloor subsequently filed suit against Ollin in Arizona state court, alleging negligence in the loading of the granite slabs (the "Arizona Case"). Ollin tendered defense of the Arizona Case to Bankers in 2004. Bankers declined coverage on multiple occasions and refused to defend Ollin, without making a reservation of its rights. In exchange for Bloor's agreement not to collect against Ollin for any damages, Ollin agreed to submit the matter to binding arbitration and to assign Ollin's coverage and bad faith rights against Bankers to Bloor. The Arizona Case ultimately resulted in a $9.5 million judgment against Ollin and in favor of Bloor.

In 2006, in his capacity as assignee of Ollin's rights, Bloor sued Bankers in California state court alleging, among other things, breach of contract and bad faith (the "Bad Faith Case"). Bloor also named ATM and Doctor as defendants in the Bad Faith Case, alleging various claims against all parties, including negligence and fraud. ATM was subsequently dismissed from the case after filing a motion to dismiss. Doctor was voluntarily dismissed by Bloor.

In the Bad Faith Case, Bloor claimed that a renewal policy had been created because Ollin paid Doctor a premium for the renewal of the Bankers policy and at all material times believed the policy had indeed been renewed. Bloor claimed that Doctor's action in issuing the Certificate of Liability Insurance and retaining the premium payment bound Bankers because Doctor was acting as Bankers' agent. In the alternative, Bloor alleged that Ollin never directly received statutorily-required notification of non-renewal of the Bankers policy, thereby continuing the Bankers policy beyond its original expiration by operation of California law and affording coverage on the date of Bloor's accident.

On July 14, 2010, citing, among other things, its probable liability to Bloor due to certain adverse rulings from the court and evidence developed in the Bad Faith Case,

Bankers entered into a settlement agreement with Bloor, pursuant to which Bankers agreed to pay Bloor $1.8 million. On October 15, 2010, Bankers filed suit against ATM in Florida state court. (Doc. # 1). ATM removed the case to this Court on November 23, 2010, and thereafter sought dismissal of Bankers' breach of contract and negligence counts. (Id.; Doc. # 6). Bankers filed an amended complaint on January 4, 2011, eliminating the breach of contract and negligence counts and alleging one count for contractual indemnification in the amount of $1.8 million plus attorneys' fees and costs for its defense and settlement of the Bad Faith Case.

The parties' cross motions for summary judgment are now before the Court.

## II.  Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-

moving party's favor.  Shotz v. City of Plantation, Fla., 344
F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder
evaluating the evidence could draw more than one inference
from the facts, and if that inference introduces a genuine
issue of material fact, the court should not grant summary
judgment.  Samples ex rel. Samples v. City of Atlanta, 846
F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel
Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856
(11th Cir. 1988)).  However, if the non-movant's response
consists of nothing "more than a repetition of his
conclusional allegations," summary judgment is not only
proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034
(11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

## III. Analysis

### A.  Contractual Indemnity

In this case, Bankers is seeking contractual
indemnification from ATM for the $1.8 million settlement it
paid Bloor in the Bad Faith Case, pursuant to the following
provision of the parties' General Agency Agreement:

> The General Agent [ATM] agrees to indemnify and
> hold the Company [Bankers], its subsidiaries,
> successors and assigns, and shareholders,
> directors, officers, agents and employees of any of
> them (collectively, the "Company Indemnitees"),
> harmless against and in respect of any and all
> claim (which shall not include covered claims made

under any Policy properly issued in accordance with this Agreement), demands, actions, proceedings, liability, losses, damages, judgments, costs and expenses, including, without limitation, attorneys' fees, disbursements and court costs, made or instituted against or incurred by the Company Indemnities, or any of them, and which arise, directly or indirectly out of any act or omission of the General Agent or any Agent, or their employees or representatives, in connection with any obligation of the General Agent arising under or relating to this Agreement, including any act or omission of the General Agent regarding the termination of any Agent pursuant to applicable laws. The foregoing indemnification shall extend to any loss incurred by the Company Indemnitees in excess of policy limits as well as any extra-contractual obligations, including but not limited to punitive, exemplary, compensatory or consequential damages suffered by the Company Indemnitees arising out of, or resulting from, alleged or bad faith or negligence of the General Agent or any Agent, or their employees or representatives, in discharging their obligations hereunder or to the insured.

(Doc. # 14-1 at 8).

ATM argues that Bankers is not entitled to indemnification under this provision because the provision does not contain sufficient language to require ATM to indemnify Bankers for liability arising out of Bankers' own actions. ATM argues that since the settlement in the Bad Faith Case included settlement of Bloor's claim against Bankers (and only Bankers) for Bankers' bad faith claims handling practices, Bankers is not entitled to indemnity for any portion of the settlement.

Under Florida law, "contracts of indemnification which attempt to indemnify a party against its own wrongful acts are viewed with disfavor." <u>Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip. Co.</u>, 374 So. 2d 487, 489 (Fla. 1979). Accordingly, "[s]uch contracts will be enforced only if they express an intent to indemnify against the indemnitee's own wrongful acts in clear and unequivocal terms." <u>Id.</u>; <u>see</u> <u>also</u> <u>Univ. Plaza Shopping Ctr. v. Stewart</u>, 272 So. 2d 507 (Fla. 1973)(finding the use of general terms "indemnify against any and all claims" insufficient to disclose an intention to indemnify for consequences arising solely from the negligence of the indemnitee). The Court agrees with ATM that the indemnity provision at issue does not contain such clear and unequivocal language necessary to indemnify Bankers for its own negligence or wrongful conduct, and Bankers does not contest this point.

The Court also finds the provision insufficient to require indemnity for any instances in which ATM and Bankers may be jointly liable. <u>See</u> <u>Charles Poe Masonry, Inc.</u>, 374 So. 2d at 490 (extending the holding of <u>University Plaza</u> to cases where the indemnitor and indemnitee are jointly liable); <u>Leonard L. Farber Co. v. Jaksch</u>, 335 So. 2d 847, 848-49 (Fla. 4th DCA 1976)(finding the language "occasioned wholly or in

part by any act or omission of [indemnitor]" sufficiently clear and unequivocal to hold the indemnitor liable for the joint negligence of itself and the indemnitee); <u>Gulfstream Park Racing Ass'n, Inc. v. Gold Spur Stable, Inc.</u>, 820 So. 2d 957, 963 (Fla. 4th DCA 2002)(same). Again, Bankers does not contest that the instant provision is insufficient to require indemnity for any joint liability between ATM and Bankers.

Instead, Bankers maintains that it does not seek to recover for any liability arising from its own actions, in whole or in part, but rather seeks to recover for liability that arose solely out of ATM's and/or Doctor's actions, both of which are covered by the indemnity provision. Specifically, Bankers argues that "ATM failed to fulfill its supervisory obligations to oversee Doctor's activities" and that "ATM's mishandling and purported renewal of an expiring Bankers liability policy caused the exposure Bankers incurred by the settlement in the Bad Faith Suit. These actions caused Bankers to face a claim under a policy - the Renewal Policy - that was improperly issued." (Doc. # 47 at 5). In other words, Bankers argues that had ATM not committed errors in overseeing Doctor and in handling the renewal of the policy, the insured would never have mistakenly believed its Bankers policy had been renewed and Bankers would never have faced

exposure, either contractual or bad faith, for Bloor's claim that came after the expiration of the original policy.

In this lawsuit, Bankers seeks recovery of the full amount of its $1.8 million settlement paid to Bloor. However, in its motion, Bankers seeks only partial summary judgment for the amount it claims represents the policy limits, $1 million. Bankers leaves the question of indemnity for the remaining $800,000 of the settlement, which it claims represents the amount paid to settle the bad faith count, for trial.

ATM argues that, under Florida law, an indemnitor must be entirely without fault in order to be entitled to indemnity. See Weissman v. Boating Magazine, 946 F.2d 811, 813 (11th Cir. 1991) ("A weighing of the relative fault of tortfeasors has no place in the concept of indemnity for one seeking indemnity must be without fault.")(citations omitted). ATM argues that even if ATM's actions were the cause of a portion of the settlement, Bankers cannot recover any amounts it paid in settlement because Bankers was solely at fault for the bad faith claims-handling practices that constituted a portion of the settlement. ATM further contends that apportionment between ATM's liability and Bankers' liability is not allowed under Florida law. See id.

The Court finds that ATM's argument against apportionment

pertains to common law indemnity claims only and, as such, is inapplicable to the instant contractual indemnity case. Rather, "[i]n cases involving contractual indemnity, the terms of the agreement will determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim." Camp, Dresser & McKee, Inc. v. Paul N. Howard Co., 853 So. 2d 1072, 1077 (Fla. 5th DCA 2003). ATM's arguments to the contrary, under this principle, Florida courts have allowed a party to seek indemnity for the covered portion of its damages caused solely by the indemnitor's conduct, even though the indemitee's conduct may have caused other portions of the incurred damages.

For example, in Metropolitan Dade Cty. v. Florida Aviation Fueling Co., Inc., 578 So. 2d 296 (Fla. 3d DCA 1991), the court considered whether the defendant was required to indemnify the plaintiff, Dade County, for the full amount paid by the County to settle an underlying case. As here, the defendant argued that because the indemnity provision did not cover the County's own negligence, the County was barred from recovering any portion of the settlement payment. Noting that "in reality [the underlying] plaintiff proceeded against the County on a claim for vicarious liability as well as negligence," the court determined that "[u]nder the indemnity

-13-

clause at issue, the County is entitled to indemnity for the former, but not the latter." Id. at 298. With this in mind, the court ruled that "when a settlement is paid, the party seeking indemnification has the burden to show that the settlement, or portions thereof, [fall] within the coverage of the indemnity clause" and remanded the case for a determination of what portion of the settlement was covered under the indemnity agreement. Id.

Similarly, in Association for Retarded Citizens v. State Dep't of Health & Rehabilitation Service, 619 So. 2d 452 (Fla. 3d DCA 1993), the court reversed summary judgment in favor of the indemnitee, HRS, in order to determine what portion of the settlement agreement was actually covered by the parties' indemnity contract. The court reasoned:

> There is no question that, under Florida law, the particular indemnification agreement at issue could not require ARC to indemnify HRS for HRS' own negligence. In other words, there could be no indemnification for damages stemming from the second category of claims (HRS' direct liability), while there could be indemnification for damages stemming from the first category of claims (vicarious liability due to ARC's negligence). . . . The dilemma then becomes how to go about apportioning the proceeds of the private settlement agreement between the distinct types of claims, when such apportionment becomes necessary in order to subsequently determine liability as to other causes of action and/or other parties. This dilemma, which requires us to balance the rights of codefendants to fairly apportion liability against

the public policy which encourages settlements, is
not unfamiliar to the courts of this state.

Id. at 454.

The Court also finds the brief opinion articulated by
Florida's Fourth District Court of Appeal in American Chambers
Life Insurance Co. v. Power, 690 So. 2d 683 (Fla 4th DCA
1997), to be on point and instructive.  In Power, the court
reversed the trial court's dismissal of American Chambers'
claim for indemnity against its agent, Power, stating:

> We note that this cause of action against Power may
> extend only to damages arising out of American
> Chambers' contractual liability to its insured,
> incurred as a result of unauthorized acts and fault
> of the agent.  Indemnity may not  be sought for
> damages awarded the insureds for the subsequent bad
> faith conduct of American Chambers.

Id. at 683-84.

Accordingly, based on these decisions and the unambiguous
terms of the indemnity provision in the General Agency
Agreement, the Court finds that Bankers is entitled to
indemnity from ATM for the portion, if any, of the settlement
paid to Bloor which was not caused, in whole or in part, by
Bankers' own conduct, but instead was caused solely by ATM's
and/or Doctor's conduct.  The Court grants Bankers' motion and
denies ATM's motion on this issue.

**B.    Covered Claim Exception**

ATM next argues that even if Bankers could establish entitlement to indemnity under the General Agency Agreement provision, the claim falls within the "covered claim" exception to the provision, such that indemnity is precluded. The indemnity clause in the Agreement expressly states that it does not "include covered claims made under any Policy properly issued in accordance with this Agreement." (Doc. # 14-1 at 8). Although no finding of coverage was ever made in the Bad Faith Case, ATM argues that Bankers' settlement of the case evinces that the claim was covered. Specifically, ATM argues that "Either [Bankers] settled a bad faith claim (in which case, its recovery is precluded because the indemnity language it drafted does not cover its own fault), or it settled and paid on a 'covered claim.'" (Doc. # 46 at 20).

The Court is not convinced. The mere fact that Bankers settled the Bad Faith Case does not in and of itself mean that the claim that formed the basis of the lawsuit was covered by the Bankers policy. "Because parties often make offers to settle for economic reasons, an offer is not treated like an admission of liability." Sullivan v. Galske, 917 So. 2d 412, 414 (Fla. 2d DCA 2006); see also Mortg. Guar. Ins. Corp. v. Stewart, 427 So. 2d 776, 780 (Fla. 3d DCA 1983)("[T]he settlement here could not, as urged, constitute a binding

-16-

admission by the plaintiff . . . that it was at fault in the instant tort incident as alleged in the original complaint; settlements or offers of settlement have never been considered admissions against interest binding on the parties making them.").  Given the numerous reasons Bankers may have had to settle the Bad Faith Case, the Court will not treat its settlement of the case as an admission that it engaged in bad faith or that the Ollin claim was covered under either the original policy or any purported renewal policy.

ATM further argues that Bankers' failure to send a written notice of non-renewal to the insured as required by California Insurance Code § 678.1(b)-(d) caused the original "properly issued" policy to "continue" by operation of law.[1] ATM asserts that because the Ollin claim was made under the "continued" properly issued original policy, the claim is covered and, therefore, excluded by the indemnity provision.

Section 678.1, Cal. Ins. Code, provides, in relevant part, as follows:

> (c) An insurer, at least 60 days, but not more than 120 days, in advance of the end of the policy period, shall give notice of nonrenewal, and the

_____

[1]     The parties agree that, while Florida law applies to the interpretation and application of the indemnity provision, California law applies to any issues relating to the merits, if any, of the Bad Faith Case.  (Doc. # 56 at 28).

-17-

> reasons for the nonrenewal, if the insurer intends
> not to renew the policy. . .
>
> (d) If an insurer fails to give timely notice
> required by subdivision (c), the policy of
> insurance shall be continued, with no change in its
> terms or conditions, for a period of 60 days after
> the insurer gives the notice.

§ 678.1(c)-(d), Cal. Ins. Code.

Bankers, on the other hand, maintains that the failure to send a non-renewal notice created a separate "renewal" policy, not a continuation of the original policy, and contends that, due to ATM's and Doctor's errors, the renewal policy was not "properly issued" such that any claim made under it falls outside the exception to the indemnity provision. In support of its argument, Bankers cites various California court holdings which provide that an insurer's failure to give notice of non-renewal operates as an automatic renewal of the policy, although none of Bankers' cited cases specifically addresses Section 678.1(b)-(d), Cal. Ins. Code. Bankers also asserts that any failure to send a non-renewal notice was caused by ATM, who Bankers contends was the party in the best position to send the notice according to the industry standard of care. Bankers argues that "ATM cannot rely on its failure to provide the insured with a statutory notice of non-renewal to now claim that its numerous errors resulted in the

continuation of the original policy." (Doc. # 51 at 2).

Notably, Bankers also argues that the provisions of Section 678.1(b)-(d) do not apply where the insurer has made a written offer to the insured to renew the policy. See § 678.1(f)(6), Cal. Ins. Code. Indeed, it is undisputed that ATM sent a letter to Doctor prior to the expiration of the original policy, offering to renew the policy upon payment of the premium by a date certain. However, Doctor failed to timely respond to the letter or send the premium payment prior to the policy's expiration. Based on this offer of renewal which ATM extended on Bankers' behalf, the Court finds that Bankers did not intend to non-renew the policy, such that Sections 678.1(c)-(d), which only apply "if the insurer intends not to renew the policy," do not apply in this case.

Thus, the Court finds that the original policy did not "continue" by operation of law based on the failure to send a notice of non-renewal. Accordingly, the Ollin claim was not brought under a policy that was "properly issued" and the "covered claim" exception to the indemnity provision does not apply. Thus, Bankers summary judgment motion is granted and ATM's summary judgment motion is denied on this issue.

C. **Amount of Indemnity**

As previously stated, "when a settlement is paid, the

party seeking indemnification has the burden to show that the settlement, or portions thereof, [falls] within the coverage of the indemnity clause." <u>Metro. Dade Cty.</u>, 578 So. 2d at 298. Again, Bankers paid $1.8 million to Bloor to settle the Bad Faith Case.  In its motion, Bankers argues that it is entitled to a summary judgment finding that ATM must indemnify $1 million of the settlement, which Bankers contends represents the policy's limit.

"Once a legal obligation has been established in the underlying action on the part of the indemnitee, the indemnitor will become bound by a settlement agreement in a suit against the indemnitee if the indemnitor was given notice of the claim and was afforded an opportunity to appear and defend the claim, as long as the settlement was not the result of fraud or collusion." <u>Heapy Eng'g, LLP v. Pure Lodging, LTD.</u>, 849 So. 2d 424, 425 (Fla. 1st DCA 2003); <u>see</u> <u>Bagley v. W. Cas. & Sur. Co.</u>, 505 So. 2d 678, 680 (Fla. 1st DCA 1987). Thus, "where notice has been given to the indemnitor and the indemnitor has elected not to act to protect himself, he, in effect, consents to allow the indemnitee to act for him and will not be heard to complain about the outcome except in the very limited circumstance where the indemnitee was not, in fact, at risk, but nevertheless paid money that it would never

have owed to the plaintiff." <u>Camp, Dresser & McKee, Inc.</u>, 853
So. 2d at 1083. Accordingly, as to indemnified claims that
are settled, the indemnitee is entitled to indemnity upon
proof of its potential liability to the original plaintiff and
the reasonableness of the settlement. <u>Metro. Dade Cty.</u>, 578
So. 2d at 298; <u>Mortg. Guar. Ins. Corp.</u>, 427 So. 2d at 780 n.2.

The Court finds that ATM was given sufficient notice of
the Bad Faith Case because ATM was an original party to the
case prior to obtaining its dismissal. Furthermore, prior to
settling with Bloor, Bankers sent a letter to ATM advising ATM
of Bankers' indemnity claim under the General Agency Agreement
and inviting ATM to attend mediation with Bankers and Bloor.
(Doc. # 45-4 at 85-86). ATM's general agent, Christopher
Micheals, admitted receiving this letter and testified that
ATM did not attend the mediation upon advice of counsel. (<u>Id.</u>
at 82). Accordingly, ATM had sufficient notice of Bankers'
indemnity demand and an opportunity to participate in the
settlement discussions, but declined to do so. Thus, ATM is
bound by the settlement agreement, and Bankers is required to
prove potential, not actual, liability to Bloor and the
reasonableness of the settlement.

Bankers asserts that there are no genuine issues as to
any material fact that it is entitled to indemnity for at

least the $1 million policy limit. Bankers argues that its "risk of liability for $1 million, representing the renewal policy limit . . . was clearly connected to the acts and omissions of ATM and/or Doctor, triggering ATM's indemnity liability for at least that part of the $1.8 million settlement." (Doc. # 45 at 23-24).

The Court notes that the settlement agreement does not apportion the $1.8 million payment in any way between contractual damages and bad faith damages, nor does it attribute any of the damages to ATM or Doctor. (Doc. # 45-10). Bankers bases its apportionment of the damages on the testimony of its representative, Steven Strus, who testified that "in [his] mind," $1 million of the settlement was for the limits of the policy and the remaining $800,000 was for extra-contractual damages. (Strus Dep. Doc. # 45-11).

However, regardless of the apportionment between contractual damages and bad faith damages, the Court finds that a genuine issue of material fact exists regarding whether Bankers is entitled to indemnity for contractual damages. As the Court has previously explained, Bankers is entitled to recover only that portion of the $1.8 million settlement caused solely by ATM's or Doctor's conduct and not for any portion caused solely or partially by Bankers' own conduct.

Although Bankers argues that ATM's and Doctor's errors and omissions in essence effected a renewal policy upon which Bankers became liable, Bankers has not demonstrated that its own acts or omissions did not also contribute to the creation of a renewal policy. For example, Bankers argues that based on the industry standard of care, ATM was in the best position to send a notice of non-renewal to Ollin following the termination of its brokerage agreement with Doctor and cites to the deposition of Elliot Rothman in support of that argument. However, Mr. Rothman's deposition has not been filed on the record and the Court is unable to consider his testimony. Bankers cites no other evidence proving that it was not also at fault for any of the contractual damages, a burden Bankers must meet in order to establish entitlement to indemnity under the General Agency Agreement.

Further, it is not undisputed that ATM's and/or Doctor's conduct was the sole cause of the contractual liability Bankers incurred. (Doc. # 56 at 10). Accordingly, in light of the genuine issue of material fact regarding whether Bankers was at fault, either wholly or in part, for any contractual damages paid in settlement of the Bad Faith Case, the Court denies Banker's summary judgment motion as to this issue.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    Plaintiff Bankers Insurance Company's Dispositive Motion
        for Partial Summary Judgment (Doc. # 45) is granted in
        part and denied in part as detailed herein.

(2)    Defendant's Dispositive Motion for Summary Judgment (Doc.
        # 46) is denied.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>13th</u>
day of June, 2012.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record